PUBLISH

**UNITED STATES COURT OF APPEALS**

**Filed 11/18/96**

**TENET CIRCUIT**

---

NORTHERN COAL COMPANY,

      Petitioner,

   v.

      No. 95-9524

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR,

      Respondent.

--------------------------------------

JULIA D. PICKUP (widow of Charles Pickup),

      Real Party in Interest.

---

**APPEAL FROM THE OFFICE OF
WORKERS COMPENSATION PROGRAM
(NO. BRB 89-3227 BLA)**

---

Ronald E. Gilbertson, Kilcullen, Wilson and Kilcullen, Washington, D.C., for Petitioner.

Michael J. Rutledge (Thomas S. Williamson, Jr., Donald S. Shire, and Christian P. Barber with him on the brief), U.S. Department of Labor, Washington, D.C., for Respondent.

Jonathan Wilderman, Wilderman & Linnet, Denver, Colorado, for Real Party in Interest.

---

Before **ANDERSON**, **KELLY**, and **LUCERO**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Petitioner Northern Coal Company ("Northern") petitions for review of a Benefits Review Board ("Board") order affirming an order of the administrative law judge ("ALJ"). The ALJ awarded Julia Pickup survivor benefits under the Black Lung Benefits Act, 30 U.S.C. § § 901-945 (1986 & Supp. 1996) ("Act"), and held Northern liable for the benefits as a "responsible operator" under the Act. Northern argues that the ALJ erred in finding that Mrs. Pickup met her burden of proving that pneumoconiosis was a substantially contributing cause or factor in her husband Charles Pickup's death, and in concluding that Mr. Pickup was regularly employed by Northern in or around a coal mine for a period of one year. We affirm the Board's order.

## I. BACKGROUND

Mr. Pickup worked as an underground coal miner for sixteen years for a number of coal companies, and Northern was the last company for which he worked. Mr. Pickup's employment with Northern began on July 27, 1981. On April 17, 1982, he suffered a heart attack, was hospitalized, and was absent from work from April 19 through May 7, 1982. He then suffered a stroke on May 17, 1982, was again hospitalized, and was absent from work through June 11, 1982. On July 29, 1982, Mr. Pickup was again hospitalized

with heart and other health problems. He was released to return to work on August 16, 1982, but was laid off and never worked for Northern again.

Mr. Pickup filed a claim for black lung disability benefits on October 17, 1984. On June 20, 1985, he was hospitalized because of respiratory failure and persistent cardiac arrhythmia. While hospitalized, Mr. Pickup vomited and then aspirated the vomitus and died shortly thereafter on June 22, 1985. Mrs. Pickup filed a claim for survivor benefits on September 22, 1985.

Mr. Pickup's disability claim and Mrs. Pickup's survivor claim were consolidated and referred to an ALJ for a hearing which was held on February 15, 1989. After the hearing, the ALJ issued an interlocutory order determining that Northern was the responsible operator liable for any benefits to be awarded. The ALJ later issued a final order denying Northern's motion to reconsider the responsible operator issue and awarding benefits on both Mr. Pickup's disability claim and Mrs. Pickup's survivor claim.

Northern appealed the ALJ's order to the Board. On May 20, 1993, the Board issued an order affirming the ALJ's findings that Mrs. Pickup is entitled to survivor benefits and that Northern is the responsible operator, but reversed the ALJ's finding that Mr. Pickup was entitled to disability benefits. Northern filed a motion for reconsideration and suggestion for reconsideration en banc. The Board granted Northern's motion for reconsideration en banc, but affirmed the earlier Board order. Northern appeals the

Board's order to the extent that it affirms the ALJ's decisions that Mrs. Pickup proved that pneumoconiosis was a substantially contributing factor in Mr. Pickup's death and that Mr. Pickup was regularly employed by Northern for a period of one year.

## II. STANDARD OF REVIEW

Our task in reviewing the Board's order is to decide whether the Board correctly concluded that the ALJ's decision was supported by substantial evidence and not contrary to law. Hansen v. Director, OWCP, 984 F.2d 364, 368 (10th Cir. 1993); Wyoming Fuel Co. v. Director, OWCP, 90 F.3d 1502, 1505 (10th Cir. 1996). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hansen, 984 F.2d at 368 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). However, in deciding whether substantial evidence exists to support the ALJ's decision, "the court cannot reweigh the evidence, but may only inquire into the existence of evidence to support the trier of fact." Id. (quoting Kaiser Steel Corp. v. Director, OWCP, 748 F.2d 1426, 1430 (10th Cir. 1984)). Specifically, it is within the sole province of the ALJ to weigh conflicting medical evidence. Id. at 368, 370 ("[W]here medical professionals are in disagreement, the trier of fact is in a unique position to determine credibility and weigh the evidence.").

## III.  **DISCUSSION**

A.  Pneumoconiosis As a Substantially Contributing Cause or Factor in Death.

In order to receive survivor benefits, Mrs. Pickup must prove that Mr. Pickup had pneumoconiosis and that the disease was "a substantially contributing cause or factor leading to the miner's death."  20 C.F.R. § 718.205(c)(2) (1996).[1]  The regulation defines pneumoconiosis as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  20 C.F.R. § 718.201 (1996).  This regulatory definition specifically includes, among other conditions, "coal workers' pneumoconiosis [and] anthracosilicosis."  Id.  Under the

---

[1]20 C.F.R. § 718.205(c) provides in relevant part:

For the purpose of adjudicating survivors' claims filed on or after January 1, 1982, death will be considered to be due to pneumoconiosis if any of the following criteria is met:

(1) Where competent medical evidence established that the miner's death was due to pneumoconiosis, or

(2) Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis, or

(3) Where the presumption set forth at §718.304 is applicable.

(4)  However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or the principal cause of death was a medical condition not related to pneumoconiosis, unless the evidence establishes that pneumoconiosis was a substantially contributing cause of death.

-5-

regulations, a finding of pneumoconiosis may be based on any of the following: (1) a chest X-ray; (2) a biopsy or autopsy; (3) certain regulatory presumptions; or (4) a physician's sound medical judgment based on objective medical evidence. 20 C.F.R. § 718.202 (1996).

Although the regulations do not define "substantially contributing cause or factor leading to the miner's death," the Director of the Office of Workers' Compensation Programs ("Director") has interpreted this language to mean that the standard is met if the survivor proves that pneumoconiosis hastened death to any degree, and four circuit courts of appeals have adopted the Director's interpretation. See Brown v. Rock Creek Mining Co., 996 F.2d 812, 816 (6th Cir. 1993); Peabody Coal Co. v. Director, OWCP, 972 F.2d 178, 183 (7th Cir. 1992); Shuff v. Cedar Coal Co., 967 F.2d 977, 980 (4th Cir. 1992); Lukosevicz v. Director, OWCP, 888 F.2d 1001, 1006 (3d Cir. 1989). These circuits have approved the hastening death standard for a number of reasons: (1) the "significantly contributing cause or factor" standard embodied in the regulation, without definition or further explanation, is an unworkable standard, Brown, 996 F.2d at 815; Shuff, 967 F.2d at 980; (2) the hastening death standard is a workable standard set forth by the Director and is entitled to deference because it is reasonable and consistent with the regulatory language, Brown, 996 F.2d at 816; Peabody Coal, 972 F.2d at 183; Shuff, 967 F.2d at 979-80; Lukosevicz, 888 F.2d at 1005-06; see also Davis v. Director, OWCP, 936 F.2d 1111, 1116 (10th Cir. 1991) (Director's interpretation of black lung regulations is entitled

to substantial deference); and (3) the hastening death standard is consistent with Congressional intent. Lukosevicz, 888 F.2d at 1005-06. For these reasons we, likewise, adopt the Director's interpretation of "a substantially contributing cause or factor leading to the miner's death" as meaning hastening death to any degree. Accordingly, we review the ALJ's findings and conclusions to determine whether they comport with this standard.

The ALJ's opinion discussing whether Mr. Pickup had pneumoconiosis and whether the disease was a substantially contributing factor in Mr. Pickup's death was twenty-pages long and thoroughly reviewed the death certificate, Dr. Kirsch's autopsy findings, the findings of the physicians (Drs. Naeye, Repsher, and Goldblatt) who reviewed the autopsy findings and formed independent opinions, twenty chest X-ray results spanning a three-year period, pulmonary function test results from 1985, ten arterial blood-gas test results spanning a three-year period, twenty medical records, and Mr. Pickup's employment and smoking histories. See Peabody Coal, 972 F.2d at 882 (ALJ must consider all relevant medical evidence).

The ALJ concluded that the autopsy evidence, as interpreted by two physicians exercising sound medical judgment, established that Mr. Pickup had pneumoconiosis. The ALJ relied on the findings of Dr. Kirsch, the autopsy prosector, that Mr. Pickup suffered from mild to moderate anthracosilicosis which meets the regulatory definition of pneumoconiosis. See 20 C.F.R. § 718.201 (1996). The ALJ also relied on the opinion of Dr. Goldblatt, a physician who testified on behalf of Mrs. Pickup, which corroborated Dr.

Kirsch's opinion that Mr. Pickup had pneumoconiosis. The ALJ gave greater weight to the opinion of Dr. Kirsch, because he actually conducted the autopsy and wrote the autopsy report, than to the opinions of Drs. Goldblatt, Naeye, and Repsher because these physicians only reviewed the autopsy report and autopsy slides prepared by Dr. Kirsch. See, e.g., Peabody Coal Co. v. Shonk, 906 F.2d 264, 269 (7th Cir. 1990) (ALJ permissibly gave more weight to opinion of autopsy prosector who viewed lungs in their entirety than to opinions of doctors hired by employer). The ALJ also gave more weight to the opinion of Dr. Goldblatt than to the opinions of Drs. Naeye and Repsher (the two physicians who testified on behalf of the Department of Labor and Northern, respectively, and concluded that Mr. Pickup did not have pneumoconiosis) because the ALJ found that Dr. Goldblatt had "superior qualifications." See ALJ's Decision and Order, No. 86-BLA-833, at 15 (Sept. 1, 1989); see also Hansen, 984 F.2d at 368 (ALJ permissibly relied on opinions of certain physicians because ALJ found, and the record supported the conclusion, that the physicians were better qualified and more thorough than other physicians who provided opinions).

After concluding that Mr. Pickup had pneumoconiosis, the ALJ then determined that the disease was a substantially contributing factor in Mr. Pickup's death. The ALJ noted that four physicians rendered opinions regarding the causes of Mr. Pickup's death. Dr. Kirsch, the autopsy prosector, found that Mr. Pickup died of cardiopulmonary failure

-8-

and acute aspiration bronchopneumonitis.[2]  Dr. Kirsch also indicated that pulmonary emphysema[3] was a cause of death.  While Dr. Kirsch found mild to moderate anthracosilicosis, he did not state whether this pneumoconiosis (as defined by the regulation) contributed to Mr. Pickup's heart or lung conditions or whether Mr. Pickup's emphysema was caused by coal dust.

Dr. Goldblatt opined that Mr. Pickup had moderately severe pneumoconiosis and that his death was caused by:

> acute myocardial infarction which was less than 12 hours old, and which was caused by the combined effects of atherosclerotic cardiovascular disease, marked myocardial hypertrophy secondary to hypertension, and also to the effects of pulmonary insufficiency which were due to the combined effects of coal workers pneumoconiosis, focal dust and bullous emphysema and centrilobular emphysema.[4]

Dr. Goldblatt's Depo. at 16.  Dr. Goldblatt testified that "all of the causes of death . . . share[d] a role in the cause [of death]" and he was "unable to ascribe a lesser role to coal workers pneumoconiosis than to the other[] [causes]."  Id. at 17.

---

[2]Aspiration bronchopneumonitis is "an inflammation of the lungs which usually begins in the terminal bronchioles" and is caused by the inhalation of foreign matter.  Dorland's Illustrated Medical Dictionary 238, 156, 1319 (27th ed. 1988) (definitions of "bronchopneumonitis," "aspiration," and "acute aspiration pneumonia").  This condition was caused by Mr. Pickup vomiting and aspirating the vomitus.

[3]"Pulmonary emphysema" is "a condition of the lung characterized by increase beyond normal in the size of airspaces distal to the terminal bronchioles . . . ."  Id. at 547.

[4]"Centrilobular emphysema" consists of "focal dilatations of air spaces distributed throughout the lung in the midst of grossly normal lung tissue."  Id. .

Dr. Naeye found that Mr. Pickup did not suffer from pneumoconiosis and, thus, of course, the disease could not have contributed to his death in any way. Dr. Naeye did find that Mr. Pickup suffered from several diseases of the lung including moderately severe centrilobular emphysema, chronic obstructive lung disease, panlobular emphysema,[5] and chronic cor pulmonale.

Dr. Repsher found that Mr. Pickup died of left ventricular failure complicated by acute aspiration pneumonia.[6] He found no pneumoconiosis, but did find evidence of lung disease including mild to moderate centrilobular emphysema, cor pulmonale, and mild chronic obstructive pulmonary disease. He attributed Mr. Pickup's cor pulmonale to left ventricular disease. He concluded that Mr. Pickup had no significant lung disease.

Again, the ALJ gave more weight to the opinions of Dr. Kirsch, the autopsy prosector, and Dr. Goldblatt, the physician who the ALJ deemed as having superior qualifications. The ALJ specifically discredited the opinion of Dr. Repsher that Mr. Pickup had no significant lung disease because it was contradicted by the opinions of Drs. Kirsch, Goldblatt, and Naeye, the medical records, and the arterial blood-gas studies. The ALJ weighed the conflicting medical evidence and concluded:

---

[5]"Panlobular emphysema" consists of "generalized obstructive emphysema affecting all lung segments, with atrophy and dilatation of the alveoli and destruction of the vascular bed." Dorland's, supra, at 547.

[6]"Acute aspiration pneumonia" is "severe pneumonia of rapid onset . . . due to the entrance of foreign matter . . . into the respiratory passages." Id. at 1319. Acute aspiration pneumonia, in this case, was caused by Mr. Pickup vomiting and aspirating the vomitus.

> The opinion of Dr. Goldblatt stands for the proposition that pneumoconiosis significantly contributed to Decedent's cause of death. Given a finding of cor pulmonale and significant pulmonary disease by Dr. Kirsch and Dr. Naeye, as well as Dr. Goldblatt, it is determined that pulmonary insufficiency played a significant role in Decedent's cause of death. This finding is supported by the hospital records which discuss chronic obstructive pulmonary disease and emphysema, and the arterial blood gas test results of record. Dr. Goldblatt's opinion that pneumoconiosis constituted a significant portion of Decedent's overall lung disease is credited. Therefore, it is determined that pneumoconiosis was a significant factor in Decedent's death.

ALJ's Decision and Order, No. 86-BLA-833, at 19 (Sept. 1, 1989).

We conclude that the ALJ's factual findings are supported by substantial evidence and that the ALJ properly exercised his discretion in preferring the findings of Drs. Kirsch and Goldblatt. See Hansen, 984 F.2d at 368 (where medical evidence was in dispute, ALJ permissibly chose to rely upon the opinions of two particular physicians rather than the opinions of other physicians because ALJ provided reasoned explanation for the preference); Hobbs v. Clinchfield Coal Co., 45 F.3d 819, 820 (4th Cir. 1995) (affirming ALJ's decision where "ALJ set forth reasons why he attributed greater weight to certain medical opinions, and he specifically addressed each medical opinion which disagreed with his ultimate conclusion").

We further conclude that Dr. Goldblatt's testimony that pneumoconiosis was a co-equal cause, along with other conditions, of Mr. Pickup's death and the ALJ's finding that "pneumoconiosis was a significant factor in Decent's death" meet the standard of hastening death to any degree. Accordingly, the Board was correct in concluding that the

-11-

ALJ's decision that Mrs. Pickup met her burden of proving that pneumoconiosis was a substantially contributing factor in Mr. Pickup's death was supported by substantial evidence and not contrary to law.

B. Responsible Operator.

Northern is the "responsible operator" and, thus, liable for Mrs. Pickup's survivor benefits if it is the operator "with which the miner had the most recent periods of cumulative employment of not less than 1 year." 20 C.F.R. § 725.493(a)(1) (1996). To identify the responsible operator, the regulation provides the following guidance:

> From the evidence presented, the identity of the operator or other employer with which the miner had the most recent periods of cumulative employment of not less than 1 year and, to the extent the evidence permits, the beginning and ending dates of such periods, shall be ascertained. For purposes of this section, a year of employment means a period of 1 year, or partial periods totaling 1 year, during which the miner was regularly employed in or around a coal mine by the operator or other employer. Regular employment may be established on the basis of any evidence presented, including the testimony of a claimant or other witnesses, and shall not be contingent upon a finding of a specific number of days of employment within a given period. However, if an operator or other employer proves that the miner was not employed by it for a period of at least 125 working days, such operator or other employer shall be determined to have established that the miner was not regularly employed for a cumulative year by such operator or employer for the purposes of paragraph (a) of this section. A "working day" means any day or part of a day for which a miner received pay for work as a miner.

20 C.F.R. § 718.493(b) (1996).

This regulation includes two distinct requirements regarding a miner's employment in order to find that an employer is a "responsible operator": (1) a miner must have been employed by the employer for not less than one year; and (2) during the one-year employment period a miner must have been employed for "at least 125 working days" in order for the employment to be deemed "regular." Director, OWCP v. Gardner, 882 F.2d 67, 69 (3d Cir. 1989). "[T]he one-year employment requirement sets a floor for the operator's connection with the miner, below which the operator cannot be held responsible for the payment of benefits," while the "125-day limit relates to the minimum amount of time the miner may have been exposed to coal dust while in employment by that operator." Id. at 69-70.

Northern contends that it is not a responsible operator because: (1) the miner was not employed by it for at least one year; or (2) even if Mr. Pickup was employed by it for one year, during that year Mr. Pickup was not "regularly employed" in or around a coal mine. Northern maintains that because of Mr. Pickup's lengthy periods of sick leave he was not employed by Northern for a single period of one year, but rather was employed for three "partial periods" which do not total one year. In the alternative, Northern argues that even though Mr. Pickup worked the minimum of 125 days, because of the significant sick leave periods his employment was not sufficiently regular.

The evidence presented to the ALJ regarding Mr. Pickup's employment with Northern was undisputed. Based on this undisputed evidence, the ALJ found that Mr.

-13-

Pickup began working for Northern on July 27, 1981, and was laid off on August 16, 1982. See ALJ's Decision and Order, No. 86-BLA-833, at 2 (May 4, 1989). During his employment with Northern, Mr. Pickup was on sick leave for non-job related illnesses from April 19 to May 7, 1982; from May 17 to June 11, 1982; and from July 29 to August 16, 1982. Id.[7] Northern did not terminate the employment relationship with Mr. Pickup during the sick leave absences and Mr. Pickup had the right to, and did (until he was laid off), return to work after his illnesses. Id. at 4. In fact, Northern paid Mr. Pickup during his sick leave and the absences were excused. Id. The ALJ also found that Northern paid Mr. Pickup two weeks of layoff pay plus a week of vacation pay after he was laid off. Id. The ALJ concluded that Mr. Pickup "worked for Northern Coal Company as a regular employee from July 27, 1981 until August 16, 1982." Id. at 2.[8]

The ALJ's findings of fact regarding Mr. Pickup's employment with Northern are supported by substantial evidence. The ALJ's conclusion that Mr. Pickup for "a period of 1 year . . . was regularly employed in or around a coal mine by the operator," 20 C.F.R. § 718.493(b) (1996), is, likewise, supported by substantial evidence and is not contrary to

---

[7]As the Director's brief points out, Mr. Pickup worked approximately 222 days.

[8]Northern contends that the ALJ's finding that August 16, 1982, was the miner's last day of employment is erroneous because the last day the miner worked was July 28, 1982. He was then on sick leave until he was laid off on August 16, 1982. We conclude that the ALJ's finding was not erroneous because although July 28, 1982, was the last day the miner actually worked, he remained employed by Northern during his sick leave until he was laid off. In any event, even assuming that the miner's last day of employment was July 28, 1982, Northern does not contest that his first day of employment was July 27, 1981, and, thus, he was employed by Northern for "not less than 1 year."

-14-

law.  As directed by the regulation, the ALJ ascertained the beginning and ending dates of Mr. Pickup's employment with Northern and resolved that the period was not less than one year.  The ALJ then determined "on the basis of [the] evidence presented" that Mr. Pickup's employment during the one-year period was "regular."  The ALJ's determination is consistent with the regulation's mandate that a finding of "[r]egular employment . . . shall not be contingent upon a finding of a specific number of days of employment within a given period."  Finally, the ALJ noted that Northern had not rebutted the finding of regular employment by proving "that the miner was not employed by it for a period of at least 125 working days."  In short, the Board correctly concluded that the ALJ's decision that Northern is the responsible operator was supported by substantial evidence and not contrary to law.[9]

## IV.  **CONCLUSION**

---

[9]The Director urges us to affirm the Board's order based on either or both of the following premises: (1) that as a matter of law sick leave absences cannot be excluded in determining the amount of time that a miner worked for an employer; and (2) that once it is determined that a miner worked for an employer for at least one year and that the miner actually worked at least 125 days, that the employer is a "responsible operator" as a matter of law and that the ALJ has no further discretion to decide that the employment was not regular.  Because we do not believe that it is necessary to reach either of these conclusions in order to resolve this case, we decline to do so.  Rather, we hold that under the facts of this case, the ALJ's determination that Mr. Pickup, despite his significant periods of sick leave, was regularly employed by Northern for a period of one year was supported by substantial evidence and not contrary to law.

We AFFIRM the Board's order affirming the ALJ's September 1, 1989 order awarding Mrs. Pickup survivor benefits and the ALJ's May 4, 1989 order holding Northern liable for these benefits.