**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES STEEL MINING
COMPANY, INCORPORATED,
Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'

No. 98-2412

COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; IONA
S. JARRELL, Widow of Elgie K.
Jarrell, deceased,
Respondents.

On Petition for Review of an Order of the
Benefits Review Board.
(97-1689-BLA)

Argued: May 3, 1999

Decided: July 28, 1999

Before WILKINS, NIEMEYER, and TRAXLER,
Circuit Judges.

_____

Reversed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Wilkins and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Howard Gerald Salisbury, Jr., KAY, CASTO, CHANEY
& WISE, Charleston, West Virginia, for Petitioner. Roger Daniel For-

man, FORMAN & CRANE, L.C., Charleston, West Virginia, for Respondents.

_____

**OPINION**

NIEMEYER, Circuit Judge:

In this case, the Benefits Review Board affirmed an award of survivor's benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 et seq., that was not "supported by and in accordance with the reliable, probative, and substantial evidence," as required by the Administrative Procedure Act, 5 U.S.C. § 556(d). Because the Administrative Law Judge ("ALJ") failed to perform the important gatekeeping function of qualifying evidence under the Administrative Procedure Act before relying upon it, he made an award that is untenable under the Black Lung Benefits Act. Accordingly, we reverse.

I

Elgie Jarrell worked in West Virginia coal mines for more than 18 years and developed simple pneumoconiosis for which he was awarded disability benefits in April 1991. Around that same time, Jarrell also gave up his habit of smoking one and a half packs of cigarettes per day.

In July 1992, Jarrell was diagnosed with lung cancer, which, all parties agree, was not related to his pneumoconiosis. A portion of Jarrell's right lung was removed in July 1992, and thereafter Jarrell was treated unsuccessfully with chemotherapy and radiation. Over the following two years, Jarrell was admitted to the hospital several times for continuing cancer treatment. Medical reports relating to his last stay in the hospital, which lasted from June 27 to July 20, 1994, observed that Jarrell's cancer had moved to multiple areas in his body, creating "hot spots" on his skull, around his right orbit, on his humeri and femurs, and on his spine. During his stay, he was treated with medication and radiation to relieve pain. In addition to the multiple locations of "hot spots," Jarrell sustained pathologic fractures of several bones. He also developed patchy pneumonia in the lower lobe

2

of his left lung, but even though the pneumonia was persistent, it generated no fever. Eventually, Jarrell's treating physician, Dr. John F. DiStefano, concluded that Jarrell's cancer was terminal and that hospital care would no longer help him. Dr. DiStefano therefore recommended that Jarrell be taken home and be put under hospice care.

Three days after Jarrell returned home, he died. While no doctors attended to Jarrell after his discharge from the hospital, Dr. DiStefano filled out Jarrell's death certificate, reporting lung cancer as the cause of death. He reported no other conditions contributing to Jarrell's death, although the death certificate explicitly provided space for such a notation.

Shortly after Jarrell's death, in August 1994, Iona Jarrell ("Mrs. Jarrell"), his wife, filed a claim for survivor's benefits under the Black Lung Benefits Act against U.S. Steel Mining Co., Inc., claiming that pneumoconiosis substantially contributed to her husband's death. The Department of Labor denied her claim in February 1995, on the grounds that the evidence did not show that pneumoconiosis had caused Jarrell's death. Mrs. Jarrell appealed, and, following an informal conference held in September 1995, the Department of Labor referred Jarrell's medical file to Dr. Muhammad I. Ranavaya to obtain his opinion as to whether a "diagnosis of death due to pneumoconiosis can be made consistent with [specified] criteria." In its letter, the Department advised Dr. Ranavaya that "death will be considered [to be] due to pneumoconiosis . . . [w]here pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where death was caused by complications of pneumoconiosis [or] death was hastened by pneumoconiosis." Dr. Ranavaya responded to the Department's letter stating, "I have reviewed all the provided medical records & find that a diagnosis of death due to pneumoconiosis can not be made consistent with the criteria contained in the [Department's] letter. It is my reasoned medical opinion that this miner's death was <u>not</u> caused by pneumoconiosis." Accordingly, the Department again notified Mrs. Jarrell by letter that her claim was denied for the reason that it had not been established that "Jarrell's death was caused or hastened by coal workers pneumoconiosis." She requested a hearing before an administrative law judge, and her case was duly transferred to the Office of Administrative Law Judges for resolution.

3

In support of her claim, Mrs. Jarrell presented the opinion of Dr. Donald L. Rasmussen, a board-certified physician of internal medicine, who, based solely on Jarrell's medical records, gave the following opinion about the connection between Jarrell's pneumoconiosis and his death:

> The patient developed carcinoma of the lung in 1992 and underwent a pneumonectomy on the right. There is no evidence of link his coal mine dust exposure with his carcinoma of the lung. He certainly had an adequate smoking history to be considered a causative factor.
>
> During the patient's final hospitalization at Raleigh General Hospital he did develop a left lower lobe pneumonia which failed to respond to antibiotics. He was discharged to Hospice care. There is no information concerning his final events or the exact circumstances of his death. It is possible that death could have occurred as a consequence of his pneumonia superimposed upon his chronic lung disease, including his occupational pneumoconiosis and occupationally related emphysema. It can be stated that the patient's occupational pneumoconiosis was a contributing factor to his death.

Relying solely upon this opinion of Dr. Rasmussen, the ALJ found that "pneumoconiosis was a substantially contributing cause or factor leading to [Jarrell's] death" and awarded Mrs. Jarrell benefits. The ALJ determined that Ranavaya's opinion was irrelevant because "he made no determination as to whether pneumoconiosis was a contributing factor to [Jarrell's] death." Similarly, the ALJ refused to credit Dr. DiStefano's failure to make any contributing cause notation on Jarrell's death certificate: "[A]lthough the death certificate shows that lung cancer was the immediate cause of the miner's death, this finding does not preclude the determination that the miner's clinical occupational pneumoconiosis was a contributing factor to his death."

The Benefits Review Board affirmed the ALJ's award of benefits, and this appeal followed.

4

II

To receive black lung benefits as a qualifying surviving spouse of a miner, the spouse must prove (1) that the miner suffered from pneumoconiosis; (2) that the miner's pneumoconiosis arose at least in part out of coal mine employment; and (3) that the miner's death was due to pneumoconiosis. See 20 C.F.R. §§ 718.201, 718.203, 718.205(c)(1). If pneumoconiosis was not the principal cause of the miner's death, the Black Lung Benefits Act entitles a surviving spouse to benefits only if "the evidence establishes that pneumoconiosis was a substantially contributing cause of death." 20 C.F.R. § 718.205(c)(4). A showing that pneumoconiosis "hastened" the miner's death satisfies the substantial contribution requirement of 20 C.F.R. § 718.205(c)(4). See Piney Mountain Coal Co. v. Mays, ___ F.3d ___, 1999 WL 274066, at *2 (4th Cir. May 5, 1999); Shuff v. Cedar Coal Co., 967 F.2d 977, 979-80 (4th Cir. 1992). The spouse has the burden of persuasion by a preponderance of the evidence to establish each of these elements. See 30 U.S.C. § 932(a) (incorporating 33 U.S.C. § 919(d), in turn incorporating 5 U.S.C. § 554 (the Administrative Procedure Act), in turn incorporating 5 U.S.C. § 556(d)); Director, OWCP v. Greenwich Collieries, 512 U.S. 267, 270-71 (1994); Piney Mountain Coal, 1999 WL 274066, at *2.

The Administrative Procedure Act regulates Black Lung Benefits Act hearings before ALJs and supplies the standards governing the receipt of evidence. See 5 U.S.C. § 556(d); Greenwich Collieries, 512 U.S. at 270-71; Underwood v. Elkay Mining, Inc. , 105 F.3d 946, 949 (4th Cir. 1997). Section 556(d) of the Act recognizes the reality that rigorous exclusionary rules for the admission of evidence make little sense in hearings before an administrative agency where the ALJ acts as both judge and factfinder. When the judge is also factfinder, he is equally exposed to evidence whether he admits it or excludes it. See Underwood, 105 F.3d at 949. Rules for admission of evidence before ALJs are thus aimed not so much to protect the ALJ from prejudice but rather to facilitate efficiency in the process. Because the wholesale admission of all evidence would unnecessarily prolong and burden the process, the Administrative Procedure Act provides that in an administrative hearing:

5

> Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence.

5 U.S.C. § 556(d). We have concluded that this provision empowers the ALJ to admit and consider "all relevant evidence, erring on the side of inclusion." Underwood, 105 F.3d at 951. We explained:

> Because the ALJ is presumably competent to disregard that evidence which should be excluded or to discount that evidence which has lesser probative value, it makes little sense, as a practical matter, for a judge in that position to apply strict exclusionary evidentiary rules.

Id. at 949. Thus, the exclusionary rule applicable to an agency proceeding is essentially limited to relevance.

But even though the more stringent exclusionary rules of evidence, which are generally applicable to jury trials, are not justified in agency proceedings, the agency process nonetheless requires that the ALJ perform a gatekeeping function while assessing evidence to decide the merits of a claim. To assure both a fairness in the process and an outcome consistent with the underlying statutory scheme, the ALJ has, under § 556(d) of the Administrative Procedure Act, the affirmative duty to qualify evidence as "reliable, probative, and substantial" before relying upon it to grant or deny a claim. 5 U.S.C. § 556(d). Absent such a discipline to qualify evidence, administrative findings and orders could unacceptably rest on suspicions, surmise, and speculation. See White v. Apfel, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and [an agency] decision based on speculation is not supported by substantial evidence" (citations omitted)); Peabody Coal Co. v. Smith, 127 F.3d 504, 507 (6th Cir. 1997) (stating that the "miner's pneumoconiosis must be more than merely a speculative cause of his disability" before an ALJ can award benefits); Garcia v. DOWCP, 869 F.2d 1413, 1416-17 (10th Cir. 1989) (concluding that a medical expert's statement that a miner's physical condition was "probably" unrelated to his pneumoconiosis was too speculative for an ALJ to rely on in denying an award of black lung disability benefits).

6

Thus, in an agency proceeding the gatekeeping function to evaluate evidence occurs when the evidence is considered in decisionmaking rather than when the evidence is admitted. Even though it arises later in the administrative process than it does in jury trials, the ALJ's duty to screen evidence for reliability, probativeness, and substantiality similarly ensures that final agency decisions will be based on evidence of requisite quality and quantity. As the Supreme Court has observed, in enacting § 556(d) of the Administrative Procedure Act, "Congress was primarily concerned with the elimination of agency decision-making premised on evidence which was of poor quality -- irrelevant, immaterial, unreliable, and nonprobative-- and of insufficient quantity." Steadman v. SEC, 450 U.S. 91, 102 (1981).

In summary, to prove by a preponderance of the evidence each element of a claim before an administrative agency, the claimant must present reliable, probative, and substantial evidence of such sufficient quality and quantity that a reasonable ALJ could conclude that the existence of the facts supporting the claim are more probable than their nonexistence. And it follows necessarily that if the claimant presents no evidence meeting these requirements, the preponderance-of-the-evidence standard cannot be satisfied. See generally, Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951); see Clinchfield Coal Co. v. Fuller, No. 98-1949, 1999 WL 427197, at *3 (4th Cir. June 25, 1999) (remanding where ALJ failed to "fairly and scrupulously measure[ ]" the proffered medical evidence to discern its probative value); Piney Mountain Coal, 1999 WL 274066, at *8 (noting that "uncertainty is not proof, and claimants must prove entitlement").

III

We now turn to the issue presented in this case-- whether the opinion of Dr. Rasmussen satisfied the requirements of 5 U.S.C. § 556(d). Because Dr. Rasmussen's opinion was the only evidence presented to show that Jarrell's death was "due to" pneumoconiosis, if his opinion does not meet the evidentiary qualifications of § 556(d), Mrs. Jarrell cannot satisfy the burden-of-proof requirement.

Dr. Rasmussen's opinion centered on his observation that, "[i]t is possible that [Jarrell's] death could have occurred as a consequence of his pneumonia superimposed upon his chronic lung disease, includ-

7

ing his occupational pneumoconiosis and occupationally related emphysema." From this observation, Dr. Rasmussen concluded that "[i]t can be stated" that a nexus existed between Jarrell's pneumoconiosis and his death. U.S. Steel Mining argues that this opinion cannot satisfy Jarrell's burden of persuasion:

> Dr. Rasmussen has merely suggested that such a thing is possible. Dr. Rasmussen's letter is far from a reasoned medical opinion that pneumoconiosis in fact contributed in any way to the miner's death. It is merely a statement that it is possible that the condition could have contributed to death.

We agree with U.S. Steel Mining. The record shows that Jarrell experienced a horrific two-year period before his death, fighting cancer which had spread to virtually every part of his body. A portion of his lung had been removed; he had been given chemotherapy; and he had been given radiation. He was taking numerous painkillers and was virtually unable to function when he was finally discharged from the hospital to die at home under hospice care. Jarrell's treating physician during this period, Dr. DiStefano, concluded that the cause of death was cancer, and he did not identify any other contributing cause on the death certificate. Moreover, Jarrell's last month's medical records show nothing different.

Similarly, before the Department of Labor finally denied Mrs. Jarrell's survivor's claim for black lung benefits, it solicited the opinion of Dr. Ranavaya, inquiring of him whether death could have been considered "due to pneumoconiosis." In the letter soliciting Dr. Ranavaya's opinion, the Department of Labor explained that "due to pneumoconiosis" includes the situations where"pneumoconiosis was a substantially contributing cause or factor leading to the miner's death" or where it "hastened" his death. Referring explicitly to these criteria, Dr. Ranavaya stated that the medical record did not show that Jarrell's death was due to pneumoconiosis.

Against the backdrop of this record, which provided no evidence of causation between Jarrell's pneumoconiosis and his pneumonia and between his pneumonia and his death, Dr. Rasmussen appropriately acknowledged: (1) that there is no evidence in Jarrell's medical records that could "link his coal mine dust exposure with this carci-

8

noma of the lung," and (2) that he, Dr. Rasmussen, had "no information concerning [Jarrell's] final events or the exact circumstances of his death." Even yet, Dr. Rasmussen posited:"it is <u>possible</u> that death could have occurred as a consequence of his pneumonia <u>superimposed</u> upon . . . his occupational pneumoconiosis" (emphasis added) and therefore "[i]t can be stated that[Jarrell's] occupational pneumoconiosis was a contributing factor to his death." While Dr. Rasmussen's statement obviously speculated about possibilities, what is also noteworthy is that he was unable and unwilling to give an opinion with any degree of medical certainty that there was some causal relationship between either Jarrell's pneumoconiosis and his pneumonia or his pneumonia and his death. He could only say that "it is possible" that there is a causative link between Jarrell's pneumonia and his death, and he could not even hypothesize a causal relationship between the pneumonia and Jarrell's pneumoconiosis. Rather, one was merely "superimposed" over the other.

Dr. Rasmussen's opinion does not qualify as "reliable, probative, and substantial" evidence on which the ALJ could base a black lung benefits award. Moreover, it does not fulfill the claimant's burden of establishing more-probably-than-not that Jarrell's death was "due to" pneumoconiosis.

If a claimant in an agency proceeding had the burden of establishing that a traffic light was green his way, he would not satisfy his burden of proving that fact with testimony that "it is <u>possible</u> that it <u>could</u>" have been green his way. While it is possible it could have been green, it is also possible that it could have been red or yellow or even non-functioning. Because the testimony is entirely speculative, it does not advance the claimant's case. More importantly, the statement that it is possible that the light could have been green does not <u>exclude</u>, to any degree, the opposite proposition. Therefore, it cannot establish <u>more likely than not</u> that the light was green.

Similarly, Mrs. Jarrell has failed to advance evidence sufficient to establish by a preponderance of the evidence that there was a causal link between Jarrell's pneumoconiosis and his death. The only evidence in the record is Dr. Rasmussen's speculative statement, unsupported by the record that he reviewed, that "[i]t is possible that death could have occurred as a consequence of his pneumonia superim-

9

posed upon . . . his occupational pneumoconiosis." And from this speculation, he concludes that therefore "it can be stated" that there is a causative link.

What makes this conclusion yet more speculative is that the record on which Dr. Rasmussen relied demonstrates that Jarrell's pneumonia was contracted early on during the last month he was in the hospital and that even though it was persistent, it was "patchy" and did not even produce a fever. There is not even a hint in the record that this pneumonia was related to Jarrell's death or indeed that the pneumonia was in any way related to Jarrell's pneumoconiosis.

While we considered a somewhat similar factual situation in Piney Mountain Coal, coming to the conclusion that the evidence there was sufficient to support an award of benefits, the relationship between death and the claimant's pneumoconiosis in that case was established by actual evidence, not by speculation. The testimony in Piney Mountain Coal established that the claimant's death "was respiratory failure occasioned by an inability to expectorate mucus." Piney Mountain Coal, 1999 WL 274066, at *7. It was undisputed that the claimant had "severe" simple coal worker's pneumoconiosis as well as other respiratory diseases and that if the pneumoconiosis were severe, it could hamper the expectoration of mucus, the established cause of death. Id. Under those circumstances, we held, "[t]he ALJ could reasonably infer that one or some combination of [the claimant's pulmonary] diseases," including pneumoconiosis "led to the inability to expectorate" and therefore to the claimant's death. Id. at *8. In that case, we also concluded that a physician, who testified that pneumoconiosis "could be considered a complicating factor in the demise of Mr. Mays," used the word "could" in a manner consistent with his observed practice of delivering his opinions on cautious terms in a context where his overall opinion was "an affirmative assertion that pneumoconiosis contributed to Mays' death." Id. at *8, *9, & *8 n.13.

The circumstances in Piney Mountain Coal differ substantially from those before us. While in Piney Mountain Coal, there was evidence that "severe" pneumoconiosis can prevent the expectoration of mucus and that the immediate cause of the miner's death was the inability to expectorate mucus, in the case before us there is no comparable evidence that would permit the inference of a causal link

10

between pneumoconiosis and the miner's death. Indeed, there is a total absence of any medical evidence showing that Jarrell's pneumoconiosis had any relationship of any kind either to his pneumonia or to his death. Against such a background, it was pure speculation for Dr. Rasmussen to have concluded that "[i]t is possible that death could" have occurred as a consequence of pneumonia which in turn was only "superimposed" over Jarrell's pneumoconiosis.

Absent Dr. Rasmussen's speculative opinion, the ALJ was without <u>any</u> evidence upon which to base a finding that Jarrell's death was hastened by pneumoconiosis. Accordingly, we must vacate the ALJ's award as unsupported by substantial evidence.

<u>REVERSED</u>

11