HENRY, Chief Judge.
During his thirty-year employment as a coal miner and foreman, the petitioner, Terry Gunderson, was exposed to coal dust and developed chronic obstructive pulmonary disease. In January 2001, Mr. Gunderson received a letter from the National Institute for Occupational Safety and Health informing him that an x-ray taken as part of a monitoring program indicated that he suffered from pneumoconiosis, “a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment.” 30 U.S.C. § 902(b). Pneumoconiosis “encompasses a cruel set of conditions that afflict a significant percentage of the nation’s coal miners with ‘severe, and frequently crippling, chronic respiratory impairment.’ ” Nat’l Mining Ass’n v. Dep’t of Labor, 292 F.3d 849, 854 (D.C.Cir.2002) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 6, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)).
In response to this letter, Mr. Gunderson sought benefits from Blue Mountain Energy, his longtime employer, under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§ 901-45 (the “Black Lung Benefits Act”). He alleged that he suffered from “clinical pneumoconiosis” and “legal pneumoconiosis.” See 20 C.F.R. § 718.201 (discussing those two diseases).
The District Director of the Office of Workers’ Compensation Programs granted Mr. Gunderson’s claim for benefits, but Blue Mountain Energy appealed that decision to an administrative law judge (“ALJ”). The ALJ heard conflicting evidence: Mr. Gunderson’s doctors concluded that he suffered from pneumoconiosis arising from coal dust exposure and that he was disabled because of the disease, while doctors testifying on behalf of Blue Mountain Energy opined that Mr. Gunderson’s respiratory problems were caused by chronic obstructive pulmonary disease arising, from his smoking habit.
After reviewing the evidence, the ALJ rejected Mr. Gunderson’s claims. With regard to clinical pneumoconiosis, the ALJ found that the medical reports did not support Mr. Gunderson’s contentions. As to legal pneumoconiosis, the ALJ found that the doctors’ reports, while conflicting, *1016 were all “well-reasoned,” “well-documented,” and “well-supported.” Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22. In the ALJ’s view, both parties’ experts’ opinions were entitled to equal weight. The ALJ therefore denied the claim on the ground that Mr. Gunderson had not met his burden of proving that his chronic obstructive pulmonary disease was caused by his work as a coal miner. The Department of Labor’s Benefits Review Board affirmed the ALJ’s decision.
In this appeal, Mr. Gunderson challenges only the ALJ’s ruling regarding legal pneumoconiosis. He argues that the ALJ (1) failed to provide a sufficient explanation of the decision to deny that claim; and (2) erred in excluding a letter from the Director of the Division of Respiratory Disease Studies at the National Institute of Occupational Health and Safety reporting that an x-ray was positive for pneumoconiosis.
We agree with Mr. Gunderson that the case should be remanded for further proceedings. The ALJ’s cursory statement that the evidence from both parties was entitled to equal weight does not constitute a sufficient reason or basis for his decision, as required by the Administrative Procedures Act, 5 U.S.C. § 557(c)(3)(A). However, we further conclude that the ALJ did not err in excluding the Director’s letter.
I. BACKGROUND
Most of the relevant facts are not disputed. We begin with Mr. Gunderson’s particular circumstances and then turn to the regulatory scheme implementing the Black Lung Benefits Act and the proceedings in this case.
A. Mr. Gunderson’s employment and medical history
Mr. Gunderson worked more than thirty years in underground coal mines, beginning in January 1965, when he accepted a position in Geneva, Utah. In 1973, he became a superintendent of that mine, which required him to work underground half of the time. In 1977, he moved to Colorado and worked as director of operations at a mine there until 1981.
In the 1980s, Mr. Gunderson engaged in a variety of other activities. He ran a retail business with his ex-wife, drove a truck, and did some warehouse work.
Mr. Gunderson returned to coal mining in 1989, when he accepted a position as a safety inspector with Blue Mountain Energy’s underground mine in Rangely, Colorado. He was promoted to shift foreman and then to general foreman, and he continued to work at that same mine until January 2004. Throughout much of his career as a coal miner, Mr. Gunderson smoked cigarettes. He began in 1962 and quit in 1996, consuming about a pack each day during that period.
Blue Mountain Energy’s Rangely mine produced as much as two million tons of coal each year. The company used continuous mining techniques, including a long-wall machine that would produce up to 2,500 tons of coal each hour. At the evidentiary hearing, Mr. Gunderson explained that these mining activities generated large amounts of coal dust. In his words, “[e]oal mining is a dusty business. If you’re not eating coal dust, you’re blowing rock dust.” Rec. Tr. of May 18, 2006 Hr’g, at 34.
Mr. Gunderson reported that his work in the coal mine required extensive physical activity. He sometimes walked 10 to 15 miles a day, often while carrying up to ten pounds of equipment. He also had to lift 30 to 50 pound logs, as well as 75 to 150 pound timbers, which were used to reinforce the roof.
Despite these physical demands, Mr. Gunderson reported little difficulty in do *1017 ing his coal mining work until the latter part of his career. He testified at the evidentiary hearing that, by 2004, “I couldn’t keep up the pace. I was fatigued all the time.... I could walk on level ground. I could even walk up some grades. But by the end of the day, I was just so beat, I went home, I walked in the house and flopped in my chair and didn’t get up till I went to bed.” Id. at 44. He further stated that he now lacks the stamina he once had to do chores at home and that, in attempting these tasks, he becomes short of breath. “I do a little bit and then I go sit down and rest.... I just don’t have the stamina. Seems like I wear out easy.” Id. at 46.
In the administrative proceedings, the parties introduced substantial medical evidence, providing a detailed account of the onset of Mr. Gunderson’s pulmonary disease. In particular, in April 1989, a report of Mr. Gunderson’s regular physical examination described him as healthy except for mild, nonspecific interstitial disease, which a radiologist noted on an x-ray.[1] Subsequent x-ray readings contained similar findings. In October 1994, a radiologist read Mr. Gunderson’s x-ray as showing mild to moderate, nonspecific interstitial disease. In June 1997, the same radiologist concluded that Mr. Gunderson’s x-ray revealed chronic obstructive pulmonary disease and mild nonspecific interstitial disease, as well as small areas of atelectasis, a condition in which all or part of a lung becomes airless and collapses.
In July 1997, Mr. Gunderson had a lung scan, which showed a mild deficiency in blood circulation in the upper part of the lungs. That same month, he underwent a stress test on a treadmill, which showed no chest pain or arrhythmia and indicated normal blood pressure. However, in 1998, a radiologist at St. Mary’s Hospital read Mr. Gunderson’s x-ray and reported that “[t]he lungs are hyperexpanded consistent with underlying emphysema. There is linear scarring at the right lung base.” Rec. Employer’s Ex. 8, at 56.
In August 2000, Mr. Gunderson reported fatigue and shortness of breath to a family practitioner, who diagnosed chronic obstructive pulmonary disease. That same month, Mr. Gunderson submitted to an x-ray as part of a monitoring program administered by the National Institute of Occupational Safety and Health. In January 2001, he received a letter from Ronald Schell of the Mine Safety Health Administration informing him that the August 2000 x-ray “[sjhows you have enough coal workers’ pneumoconiosis (‘black lung’) to be eligible for the ‘option to work in a low dust area’ of a mine.” Rec., Director’s Ex. 18.
In April 2001, Mr. Gunderson again reported fatigue to a treating physician. In September 2001, a physician at the Western Colorado Lung Center evaluated Mr. Gunderson and diagnosed “[s]imple coal workers’ pneumoconiosis” and “probable mild chronic obstructive pulmonary disease” connected to his “[hjistory of tobacco use.” Rec. Employer’s Ex. 6, at 4.
B. Statutory and Regulatory Background
The Black Lung Benefits Act, 30 U.S.C. §§ 901-45, defines pneumoconiosis as “a chrome dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal *1018 mining employment.” 30 U.S.C. § 902(b). “It is caused by inhaling coal dust into the lungs over a long period.” Energy West Mining Co. v. Oliver, 555 F.3d 1211, 1214 (10th Cir.2009) (internal quotation marks and citations omitted); see also Dorlands Illustrated Medical Dictionary 1315 (28th ed.1994) (defining pneumoconiosis as “a condition characterized by permanent deposition of substantial amounts of particulate matter in the lungs, usually of occupational or environmental origin, and by the tissue reaction to its presence” and defining coal workers’ pneumoconiosis as “a form caused by deposition of large amounts of coal dust in the lungs, typically characterized by centrilobular emphysema”). As coal workers’ pneumoconiosis advances, it may cause physical disability and ultimately “may induce death by cardiac failure, and may contribute to other causes of death.” Usery, 428 U.S. at 7, 96 S.Ct. 2882. Congress enacted the Black Lung Benefits Act to compensate coal miners who have become totally disabled due to pneumoconiosis arising out of coal-mine employment. See 30 U.S.C. § 901(a). “To obtain benefits under the [Black Lung Benefits Act], a miner must demonstrate that he satisfies three conditions: (1) he or she suffers from pneumoconiosis; (2) the pneumoconiosis arose out of coal mining employment; and (3) the pneumoconiosis is totally disabling.” Energy West, 555 F.3d at 1214. Black lung benefits are normally paid by a miner’s employer. Nat’l Mining Ass’n v. Dep’t of Labor, 292 F.3d 849, 854 (D.C.Cir.2002); see also 30 U.S.C. §§ 932, 934. If the employer cannot be identified, the claim is paid from the Black Lung Disability Trust Fund administered by the government and financed by a tax on coal. Nat’l Mining Ass’n, 292 F.3d at 854.
Although the Black Lung Benefits Act offers a general definition of pneumoconiosis, see 30 U.S.C. § 902(b), the statute does not set forth the standards to be used in determining whether a particular lung disease satisfies this definition. However, pursuant to its authority to implement the Black Lung Benefits Act, see id. § 936(a), the Department of Labor has promulgated regulations interpreting § 902(b)’s definition of pneumoconiosis to encompass two distinct types of compensable lung diseases: clinical pneumoconiosis and legal pneumoconiosis. See 20 C.F.R. § 718.201(a). This interpretation comports with the approach that many circuits had previously followed. See Andersen v. Dir., Office Of Workers’ Comp. Programs, 455 F.3d 1102, 1103 n. 2 (10th Cir.2006) (citing those cases).
According to the Department of Labor’s regulations, “clinical pneumoconiosis” consists of those lung diseases the medical community refers to as pneumoconiosis— “the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure.... ” 20 C.F.R. § 718.201(a)(1). These diseases include, for example, “coal workers’ pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment.” Id.
In contrast, “legal pneumoconiosis” describes a broader class of lung diseases that are not pneumoconiosis as the term is used by the medical community. The term includes “any chronic lung disease or impairment and its sequelae” including “any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment.” 20 C.F.R. § 718.201(a)(2). A chronic restrictive or obstructive pulmonary disease arises out of coal-mine employment if it is “significantly related to, or substantially aggravated by, dust exposure in coalmine employment.” Id. § 718.202(b).
*1019 Under the Black Lung Benefits Act, the administrative process begins when a miner or his or her survivor files a claim with the District Director of the Department of Labor’s Office of Workers’ Compensation Programs. The District Director investigates the claim, notifies the interested parties, and makes a preliminary determination whether the claimant is eligible for benefits and whether a particular mine employer should be held responsible. 20 C.F.R. §§ 725.301-.422; see also Nat’l Mining Ass’n, 292 F.3d at 854 (discussing the benefits claims and appeals process).
After the District Director renders a decision, either party may appeal to an ALJ and request a hearing. In turn, the ALJ’s decision may be appealed by either party to the Department of Labor’s Benefits Review Board, and, ultimately, to the United States Court of Appeals for the circuit in which the injury occurred. 33 U.S.C. § 921(c). The hearings and appeals are governed by the Administrative Procedures Act, 5 U.S.C. §§ 500-706. See 33 U.S.C. § 919(d) (providing that hearings on claims for compensation under the Longshore and Harbor Workers’ Compensation Act are governed by the Administrative Procedures Act provision regarding adjudicatory hearings, 5 U.S.C. § 554); 30 U.S.C. § 932(a) (applying § 919(d) to claims for benefits under the Black Lung Benefits Act); 5 U.S.C. §§ 556-557 (establishing requirements for considering evidence and issuing findings that apply when adjudicatory hearings are required under § 554).
C. Mr. Gunderson’s Claim for Benefits and the Administrative Proceedings
After he received the January 2001 letter reporting that his x-ray was positive for pneumoconiosis, Mr. Gunderson filed a claim under the Black Lung Benefits Act. The District Director granted his request, finding that Mr. Gunderson suffered from pneumoconiosis, was totally disabled by it, and that Blue Mountain Energy was the responsible operator.
Blue Mountain Energy then appealed to an ALJ and requested a formal hearing. The parties presented conflicting evidence, including x-ray reports, reports from physicians (some of whom examined Mr. Gunderson and some of whom merely reviewed his treatment records), and a 1998 CT scan. Six x-ray reports concluded that Mr. Gunderson had pneumoconiosis. Five x-ray reports found no evidence of the disease, as did the report of the CT scan. Three physicians (Drs. Mark Shockey, Robert Cohen, and John Parker) concluded that Mr. Gunderson had pneumoconiosis, while two other physicians disagreed (Drs. Lawrence Repsher and Joseph Renn).
After hearing this evidence, the ALJ issued a decision denying Mr. Gunderson’s claim for benefits. The ALJ addressed both types of pneumoconiosis described by Department of Labor regulations: clinical and legal pneumoconiosis. See 20 C.F.R. § 718.201(a).
As to clinical pneumoconiosis, the ALJ concluded that the lack of a definitive indication of “substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment,” 20 C.F.R. § 718.201, meant that Mr. Gunderson had not established that he had that disease. The ALJ noted the disagreement among the physicians who had reviewed the x-ray evidence and added that two of the doctors who had found that Mr. Gunderson had suffered from pneumoconiosis (Drs. Cohen and Shockey) had relied on inadmissible expert reports in reaching their conclusions. Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 20. “Given the x-ray evidence available to Dr. Cohen after discounting the inadmissible reports, it seems *1020 unlikely that a finding of clinical pneumoconiosis could be maintained.” Id.
As to legal pneumoconiosis, the ALJ found that there was “clearly a difference of opinion among well-qualified physicians who have given detailed statements in this case.” Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 21. The ALJ assessed the conflicting evidence as follows:
All of the physicians are extremely qualified to discuss [Mr. Gunderson’s] pulmonary problems. Except for Dr. Shockey, who did not provide an extensive curriculum vitae, all have had significant experience with internal and pulmonary medicine, including the publication of articles in this field, professional appointments in the field of pulmonary medicine and teaching positions at local universities. Further, all of their reports are well-reasoned and well-documented. Moreover, despite the fact that Drs. Renn and Cohen disagree as to the meaning of some of [Mr. Gunderson’s] test results, their findings and reports are each well-supported.
The undersigned finds that these reports are evenly balanced, and should receive equal weight. As is noted above, the Claimant bears the burden of establishing the presence of pneumoconiosis by a preponderance of the evidence. The Claimant has not proven that he has legal pneumoconiosis.
Since the Claimant has not established the presence of either clinical or legal pneumoconiosis, the criteria of § 718.202(a)(4)[2] has not been met.
id at 22 (footnote omitted). The ALJ therefore denied Mr. Gunderson’s claim for benefits.
In the course of his decision, the ALJ excluded a January 2001 letter from the Director of the Division of Respiratory Disease Studies at the National Institute of Occupational Health and Safety to the Chief of the Division of Health of the Mine Safety Health Administration. The letter reported the results of a chest x-ray as positive for pneumoconiosis. However, the referenced x-ray was not included in the record.
In explaining his decision to exclude this letter, the ALJ invoked the Department of Labor regulations that (1) limit the number of x-rays that each party may submit and (2) require x-ray reports to contain specific information:
The results of this x-ray will not be considered since the Claimant has already designated two x-ray determinations in support of his affirmative case. Since the limitations set forth in 20 C.F.R. § 725.414 (2003) are mandatory and cannot be waived, CX10 cannot be considered. Moreover, CX 10 fails to show the date the x-ray was taken, the date the x-ray was read by a doctor, the quality of the x-ray film, the name of the doctor who interpreted the x-ray, the qualifications of the doctor who interpreted the x-ray, or the type of opacities found. It therefore does not meet the standards for x-rays set forth in 20 C.F.R. §§ 718.202(a)(1); 718.102 (2002).[3]
Id. at 7.
*1021 Mr. Gunderson filed an appeal of the ALJ’s decision with the Labor Department’s Benefits Review Board. Among other arguments, he advanced the two contentions that he now raises in this appeal. The Benefits Review Board rejected both arguments, and affirmed the ALJ’s decision denying Mr. Gunderson’s claim for benefits.
II. DISCUSSION
Mr. Gunderson now argues that the ALJ (1) failed to provide a sufficient explanation of his decision to deny the claim for benefits under the Black Lung Benefits Act; and (2) erred in excluding the January 2001 letter from the Director of the Division of Respiratory Disease Studies.
A. Standard of Review
Mr. Gunderson’s first argument raises a legal question that we review de novo. See Stalcup v. Peabody Coal Co., 477 F.3d 482, 484-85 (7th Cir.2007) (examining de novo the question of whether an ALJ in a black lung case provided an adequate explanation for the denial of benefits).
In contrast, in considering Mr. Gunderson’s second argument (which challenges a decision to exclude evidence) we afford considerable deference to the agency tribunal. In general, “the formulation of administrative procedures is a matter left to the discretion of the administrative agency.” Laird v. ICC, 691 F.2d 147, 154 (3d Cir.1982). This discretion includes the power to make reasonable, nonarbitrary decisions regarding the admission or exclusion of evidence. See Second Taxing Dist. of City of Norwalk v. FERC, 683 F.2d 477, 485 (D.C.Cir.1982). Thus, “ALJs [generally] have broad authority over their hearings,” NLRB. v. Jackson Hosp. Corp., 557 F.3d 301, 305 (6th Cir.2009), and “[w]e review the ALJ’s exclusion of the evidence for an abuse of discretion.” Manna Pro Partners, L.P. v. NLRB, 986 F.2d 1346, 1353 (10th Cir.1993).
In addition, the Administrative Procedures Act directs reviewing courts to take “due account ... of the rule of prejudicial error.” 5 U.S.C. § 706. As a result, we may overturn the ALJ’s decision only if the error in excluding evidence “prejudicially affect[ed] a substantial right of a party.” See Sanjuan v. IBP, Inc., 160 F.3d 1291, 1296 (10th Cir.1998) (applying the prejudicial error rule to a judgment on a jury verdict). An error is prejudicial only “if it can be reasonably concluded that with ... such evidence, there would have been a contrary result.” Id. (internal quotation marks omitted).
B. The ALJ failed to provide a sufficient explanation of his decision that Mr. Gunderson did not suffer from legal pneumoconiosis.
Mr. Gunderson first contends that the ALJ failed to comply with the Administrative Procedures Act provision requiring agency tribunals to explain the grounds for their decisions. That provision states that
[a]ll decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—
... findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record;
5 U.S.C. § 557(c)(3)(A) (emphasis added). In Mr. Gunderson’s view, the ALJ did not provide “the reasons or basis” for rejecting *1022 the legal pneumoconiosis claim. Instead, the ALJ “just threw up his hands, implying he could not decide who was right on a scientific basis.” Aplt’s Br. at 34.
In response, Blue Mountain Energy maintains that the ALJ complied with his obligations under the APA. It further argues that the finding that Mr. Gunderson did not establish his entitlement to benefits is supported by substantial evidence and that the ALJ’s credibility findings cannot be revisited by this court on appeal.
1. Section 557(c)(3)(A)’s reasoned explanation requirement
Mr. Gunderson’s argument is grounded in fundamental principles of administrative law. Section 557(c)(3)(A), which he invokes, requires an agency’s adjudicative decision to be “accompanied by a clear and satisfactory explication of the basis on which it rests.” Barren Creek Coal Co. v. Witmer, 111 F.3d 352, 356 (3d Cir.1997) (internal quotation marks omitted). That requirement serves several important interests.
First, it enables appellate courts to engage in meaningful judicial review. Id. In addition, “[an adequate] statement of reasons or findings also helps avoid judicial usurpation of administrative functions, assures more careful administrative consideration, and helps the parties plan then-cases for judicial review.” Id.; see also Dakota Underground, Inc. v. Sec’y of Labor, 200 F.3d 564, 568 (8th Cir.2000) (observing that, in light of an agency decision’s inadequacy, “we cannot assess the correctness of the ALJ’s apparent determination that a [regulatory] violation occurred, nor can we evaluate the ALJ’s characterization of the violation as willful”); Dickson v. Sec’y of Defense, 68 F.3d 1396, 1407 (D.C.Cir.1995) (“Because the [agency] only listed the facts and stated its conclusions, but did not connect them in any rational way, the [agency’s] decisions are arbitrary and capricious. Where an agency has failed ... to explain the path it has taken, we have no choice but to remand for a reasoned explanation.” (citation, internal quotation marks, and footnote omitted)). Of course, “[t]his duty of explanation is not intended to be a mandate for administrative verbosity or pedantry. If a reviewing court can discern what the ALJ did and why he did it, the duty of explanation is satisfied.” Piney Mountain Coal Co. v. Mays, 176 F.3d 753, 762 n. 10 (4th Cir.1999) (internal quotation marks omitted).
This duty of explanation has added importance for cases in which medical or scientific evidence has been presented. “[A] scientific dispute must be resolved on scientific grounds. This requires the ALJ to articulate a reason and provide support for favoring one opinion over another.” Stalcup, 477 F.3d at 484 (internal quotation marks and citation omitted); see also Freeman United Coal Mining Co. v. Benefits Review Bd., U.S. Dept. of Labor, 879 F.2d 245, 248 (7th Cir.1989) (stating that “[e]oncomitant with the ALJ’s duty to resolve all conflicts in the medical evidence is the responsibility to provide some general articulable basis for rejecting certain key medical evidence that favors or disfavors an award of benefits”). As Judge Posner has written, that obligation comports with “the elementary principles of rational truth-seeking.” Sahara Coal Co. v. Fitts, 39 F.3d 781, 782 (7th Cir.1994). It also accords with the deference courts generally afford to agency action that “implicates scientific and technical judgments within the scope of agency expertise.” See Wyoming v. United States, 279 F.3d 1214, 1240 (10th Cir.2002) (internal quotation marks omitted). That expertise allows agencies to relax the rules of evidence because they are deemed to “have the skill needed to handle evidence that might mis *1023 lead a jury. They have a corresponding obligation to use that skill when evaluating technical evidence.” Peabody Coal Co. v. McCandless, 255 F.3d 465, 469 (7th Cir.2001) (citation omitted).
There are a variety of ways in which an agency decision may fail to meet the obligation to resolve a scientific dispute on scientific grounds. For example, it may wrongly attempt to avoid the scientific controversy altogether “by basing [its] decision on which side has more medical opinions in its favor.” Stalcup, 477 F.3d at 484. Alternatively, the agency may erroneously decide the case on a theory of reliability that has no scientific basis. See Peabody Coal, 255 F.3d at 468 (concluding that an ALJ could not base his decision on the mere fact that one expert had performed the autopsy while others with conflicting opinions had examined tissue slides because there was no “medical reason to believe that visual scrutiny of gross attributes is more reliable than microscopic examination of tissue samples as a way to diagnose pneumoconiosis”). In other instances, the agency decisionmaker may err by providing only a cursory statement that one expert’s opinion outweighs another, thereby leaving a reviewing court “unable to determine the analytic process behind the result.” Barren Creek, 111 F.3d at 354; see also Milburn Colliery Co. v. Hicks, 138 F.3d 524, 536 (4th Cir.1998) (holding that an ALJ failed to comply with 5 U.S.C. § 557(c)(3)(A) when he “relied upon summary conclusions that were not fully explained or supported”).
2. Application of § 557(c)(3)(A) in Black Lung Benefits Act cases
Our sister circuits have applied these precepts in a number of black lung cases, remanding for further proceedings when the agency has failed to adequately explain its assessment of disputed medical and scientific evidence regarding the causes of a miner’s pulmonary disease. For example, in Stalcup, the ALJ stated that “[three physicians] found no pneumoconiosis, while [two other physicians] found the existence of the disease” and then explained that “[b]eeause these opinions are entitled to equal weight, I now find that [the miner] has not established the existence of pneumoconiosis.” 477 F.3d at 484. In remanding, the Seventh Circuit held that the ALJ had impermissibly merely “counted noses” and had erred by “dodg[ing] the scientific controversy by counting the reliable physicians on each side.” Id. Because the ALJ had failed to “indicate why the opinions of [the doctors finding no pneumoconiosis] are more persuasive than the contrary opinions[,]” he failed to satisfy his § 557(c)(3)(A) obligation and a remand was warranted.
Similarly, in Barren Creek, the Third Circuit remanded a black lung case to the agency because the ALJ had “provided] virtually no explanation for his acceptance of some opinions and his rejection of others.” Ill F.3d at 355. The court observed that “the APA demands a substantially longer and more explanatory discussion on the part of the ALJ for the basis of his decision and the rejection of substantial probative evidence to the contrary” and that “[g]iven the amount and variety of medical information in the record, the one paragraph which the ALJ devotes to explaining his choices among the evidence is completely inadequate.” Id. at 355, 356.
Finally, in Milbum Colliery, the Fourth Circuit found a similar deficiency in an ALJ’s order that merely stated that “[b]ased upon the totality of the evidence, in particular the opinion of [a particular doctor], which I credit, I find that the Claimant’s coal worker’s [sic] pneumoconiosis clearly is, at least, a significant contributing cause of such total disability.” 138 F.3d at 536 (first and last alteration in *1024 original). In the court’s view, that conclusion was not supported with the “valid reasoning” required under the APA. Id. at 537; see also Sahara Coal, 39 F.3d at 783 (remanding a black lung case to the agency because “[n]othing in the administrative law judge’s opinion offers a clue as to how to choose between the two physicians’ opinions”). These cases are persuasive, and they guide our analysis here.
3. The ALJ’s decision in Mr. Gunderson’s case
Like the courts in Stalcup, Barren Creek, Milbum Colliery, and Sahara Coal, we cannot discern “the reasons or basis,” 5 U.S.C. § 557(c)(3)(A), for the ALJ’s rejection of Mr. Gunderson’s claim that he suffered from legal pneumoconiosis. The ALJ failed to resolve the “scientific dispute ... on scientific grounds.” Stalcup, All F.3d at 484 (internal quotation marks omitted).
In particular, from the ALJ’s statement that the conflicting opinions are “evenly balanced, and should receive equal weight,” Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22, we cannot tell how he evaluated their opinions. The mere fact that equally qualified experts gave conflicting testimony does not authorize the ALJ to avoid the scientific controversy by declaring a tie. See Stalcup, All F.3d at 484 (“[W]hen an ALJ is faced with conflicting evidence from medical experts, he cannot avoid the scientific controversy by basing his decision on which side has more medical opinions in his favor.”). Of course, there may be some issues as to which scientific knowledge does not permit an ALJ to identify the more probable of the disputed expert opinions. However, if that is the case, then ALJ has a duty to explain, on scientific grounds, why a conclusion cannot be reached. Stalcup, All F.3d at 484. Merely stating that the evidence is “evenly balanced, and should receive equal weight,” without further explanation, is not sufficient. See Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22.
In reaching this conclusion, we reject Blue Mountain Energy’s contention that requiring a more detailed, scientifically-grounded explanation from the ALJ sets the bar too high. See Aple’s Br. at 34 (stating that “Gunderson’s argument that the ALJ somehow is required to resolve perceived conflicts in medical literature in the course of resolving the factual disputes in the case and then relate the clinical evidence to the articles is an extraordinary demand supported by no authority”). The ALJ’s task is not to resolve general scientific controversies, but instead to determine the facts of the case at hand and apply the law accordingly. This is a task that is routinely assigned to judges and to juries and that may be accomplished by careful consideration of many factors, including “the qualifications of the respective physicians, the explanation of their medical opinions, the documentation underlying their medical judgments, and the sophistication and bases of their diagnoses.” Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 441 (4th Cir.1997); cf. Burton v. R.J. Reynolds Tobacco Co., 397 F.3d 906, 917 (10th Cir.2005) (concluding that a jury was capable of evaluating “extensive expert testimony on the scientific and medical literature describing the relationship between smoking and peripheral vascular disease” in determining whether the defendant had a duty to warn of those risks); Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1236 (10th Cir.2004) (concluding that a jury was capable of evaluating expert testimony regarding “whether copper sulfide particles found on the valve seat in this case were sufficient to cause a leak”).
Moreover, with regard to disputes concerning the existence and causes of pneumoconiosis, an ALJ has the benefit of a *1025 substantial inquiry by the Department of Labor. For example, the Department’s regulations characterize pneumoconiosis “as a latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure.” 20 C.F.R. § 718.201(c). An ALJ may properly rely on those regulations when assessing scientific testimony. See Roberts & Schaefer Co. v. Dir., Office of Workers’ Comp. Programs, 400 F.3d 992, 999 (7th Cir.2005) (concluding that an ALJ could properly limit the weight assigned to an expert opinion because the opinion “conflicted] with [20 C.F.R.] § 718.201(e)’s recognition that pneumoconiosis can be latent and progressive” and was “contrary to the congressional findings and purpose central to the BLBA”); Midland Coal Co. v. Dir., Office of Workers’ Comp. Programs, 358 F.3d 486, 490 (7th Cir.2004) (holding that an ALJ could properly rely on the Department’s finding on the scientific question whether legal pneumoconiosis is “a disease that can be latent and progressive”).
We further note that, although there are certainly instances in which agency tribunals have failed to provide a reasoned explanation in black lung cases, there are also a number of reported decisions, thankfully, in which ALJs have complied with the APA standard, even when closely disputed scientific testimony is involved. For example, in Consolidation Coal Co. v. Dir., Office of Workers’ Comp. Programs, 521 F.3d 723 (7th Cir.2008), the ALJ heard conflicting evidence from two of the same experts who testified in Mr. Gunderson’s case: Drs. Cohen and Renn. Instead of concluding, as the ALJ did here, that the experts’ testimony was “evenly balanced, and should receive equal weight,” Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22, the ALJ in Consolidation Coal offered an explanation as to why Dr. Cohen had the better view: “The ALJ found Dr. Cohen’s opinion most persuasive because he carefully discussed the substantial body of scientific evidence documenting the causal relationship between [chronic obstructive pulmonary disease] and occupational exposure.... Dr. Cohen integrated this medical evidence along with [the miner’s] medical record to conclude that coal dust exposure did contribute to his obstruction.” 521 F.3d at 726. See also Consolidation Coal Co. v. Dir., Office of Workers’ Comp. Programs, 294 F.3d 885, 889 (7th Cir.2002) (affirming an ALJ’s explicit finding that an expert’s “negative reading of the CT scan was unreliable, for the judge was of the opinion that the record failed to establish that [the expert] ha[d] sufficient knowledge, training, or expertise in reading and interpreting a CT scan for the diagnosis of legal pneumoconiosis”); Freeman United Coal Min. Co. v. Summers, 272 F.3d 473, 483 (7th Cir.2001) (concluding that an ALJ could properly credit the testimony of one expert over others because of that expert’s “remarkable clinical experience and superior knowledge of cutting-edge research”); Peabody Coal Co. v. Hill, 123 F.3d 412, 417 (6th Cir.1997) (concluding that the ALJ’s explanation was sufficient when he offered specific reasons for crediting and discounting the testimony of physicians regarding the existence of pneumoconiosis, including (a) the fact that the mining company’s experts did not “persuasively discount ] the effects of [the miner’s] thirty-seven years of underground employment in rejecting the impact of coal dust exposure in their analysis of the cause of [the miner’s] disability” and “offered no detailed analysis to support ruling out coal mine employment as the cause of [the miner’s] respiratory condition[;]” (b) that the opinions of some experts “did not take into account [the miner’s] smoking history[;]” (c) that another expert’s opinion “accounted both for coal dust exposure and smoking history in diagnosing pneumoconiosis,” and was thus the most credible; and (d) that the experts whom the ALJ found *1026 credible based their opinions “on many factors that included and extended beyond the x-ray reports”).
4. Greenwich Collieries
In rejecting Mr. Gunderson’s challenge to the sufficiency of the ALJ’s explanation, the Benefits Review Board cited the Supreme Court’s decision in Dir., Office of Workers’ Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994). There, the Court construed § 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d), which imposes the “burden of proof’ on the proponent of an order. The Court held that the phrase should be understood as having its “ordinary or natural meaning,” which, it said, was the burden of persuasion. 512 U.S. at 272, 114 S.Ct. 2251. The Court struck down a Labor Department rule (the so-called “true doubt” rule), which imposed the burden of persuasion on the party opposing a claim for benefits. As the Court explained it: “Under the Department’s true doubt rule, when the evidence is evenly balanced the claimant wins. Under § 7(c) [of the Administrative Procedures Act], however, when the evidence is evenly balanced, the benefits claimant must lose.” 512 U.S. at 282, 114 S.Ct. 2251. Under Greenwich Collieries, the APA provision controls.
In our view, Greenwich Collieries does not cure the ALJ’s order of its deficient explanation. The Supreme Court’s decision does not address the dispositive issue here — whether the ALJ’s decision was sufficiently reasoned and explained, as required by 5 U.S.C. § 557(c)(3)(A). To be sure, there may be cases in which the scientific evidence is evenly balanced. Under Greenwich Collieries, the benefits claimant could not prevail in such a case. However, from the ALJ’s cursory assessment here, we cannot conclude that Mr. Gunderson’s is such a case.
5. Remand is required
We therefore conclude that the ALJ had failed provide a sufficient explanation of his decision denying Mr. Gunderson’s claim for benefits, as required by 5 U.S.C. § 557(c)(3)(A). Accordingly we must remand the case to the Department of Labor for further proceedings.[4]
C. The ALJ did not err in excluding a letter from the Director of the Division of Respiratory Disease Studies at the National Institute of Occupational Health and Safety reporting that an x-ray was positive for pneumoconiosis.
Finally, Mr. Gunderson argues that the ALJ erred in excluding a January *1027 2001 letter from Dr. Gregory Wagner, Director of the Division of Respiratory Disease Studies at the National Institute of Occupational Safety and Health. In the letter, Dr. Wagner reports that on August 25, 2000, at Rangely District Hospital, Mr. Gunderson had a chest x-ray that detected evidence of pneumoconiosis.
At the evidentiary hearing, the ALJ initially admitted the Wagner letter. However, in his written ruling, the ALJ excluded the letter, reasoning that (1) the letter exceeded the two x-ray limit of 20 C.F.R. § 725.414(a) and (2) in any event, the letter did not meet the standards for x-rays set forth in 20 C.F.R. § 718.202(a) and § 718.102 because (a) it did not show the date the x-ray was taken and (b) it did not give the name or qualifications of the doctor who read the x-ray or the type of opacities found.
Mr. Gunderson now contends that the decision to exclude the Wagner letter was error. He argues that, notwithstanding the two-x-ray limit, the letter may be properly considered as a “treatment record” under 20 C.F.R. § 725.414(a)(4). That regulation states that “any record of a miner’s ... medical treatment for a respiratory or pulmonary or related disease, may be received into evidence.” Id.
We discern no grounds for reversal here. The governing Administrative Procedures Act provision states that “[a]ny oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence.” 5 U.S.C. § 556(d). Because the Wagner letter only referred to an x-ray but did not contain crucial information about it (e.g., who interpreted it and what it actually showed), the ALJ did not abuse his considerable discretion in excluding the letter.
Moreover, as we have noted, the APA also provides that courts reviewing agency decisions shall take “due account ... of the rule of prejudicial error.” 5 U.S.C. § 706. In light of the quantity of detailed evidence of Mr. Gunderson’s medical history already in the record, he has failed to show that the exclusion of this one letter has caused him prejudice.
III. CONCLUSION
The ALJ did not offer a scientific explanation for his conclusion that the experts’ testimony was “evenly balanced, and should receive equal weight,” and that, as result, Mr. Gunderson had failed to establish that he suffered from legal pneumoconiosis. See Rec., ALJ Materials, Dec. & Order, filed March 21, 2007, at 22. In this regard, the ALJ’s decision did not comply with the governing provision of the Administrative Procedures Act, 5 U.S.C. § 557(c)(3)(A). Although we reject Mr. Gunderson’s other challenge to the ALJ’s ruling, we must therefore REMAND the case to the Department of Labor for further proceedings consistent with this opinion.

. "Interstitial ... lung disease actually describes a group of disorders, most of which cause progressive scarring of lung tissue. This eventually affects your ability to breathe and get enough oxygen into your bloodstream. Beyond this, the disorders vary greatly." http://www.mayoclinic.com/health/ interstitial-lung-disease/DS00592.

. Thai section provides:
A determination of the existence of pneumoconiosis may also be made if a physician, exercising sound medical judgment, notwithstanding a negative X-ray, finds that the miner suffers or suffered from pneumoconiosis as defined in § 718.201. Any such finding shall be based on objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories. Such a finding shall be supported by a reasoned medical opinion.
20 C.F.R. § 718.202(a)(4).

. These provisions state in part that an x-ray report "shall specify the name and qualifications of the person who took the film and the *1021 name and qualifications of the physician interpreting the film. If the physician interpreting the film is a Board-certified or Board-eligible radiologist or a certified 'B' reader (see § 718.202), he or she shall so indicate.” 20 C.F.R. § 718.102(c).

. Mr. Gunderson also argues that the ALJ "[flailed to [cjompare the [Credentials of the [e]xperts [i]n an [e]ven-[h]anded [w]ay.” Aplt's Br. at 41. He contends that, with regard to the physicians who read the x-rays, the ALJ gave greater weight to the one with the most experience (Dr. Wiot). However, Mr. Gunderson contends, as to the doctors who examined him and reviewed his other medical records, the ALJ failed to give more weight to the more experienced ones (z.e., those who concluded that he had pneumoconiosis).
We are not persuaded by Mr. Gunderson’s argument. The ALJ had discretion to make particular credibility findings as to x-ray readers and different findings as to other doctors. See Energy West, 555 F.3d at 1217 (stating that "[w]e are especially mindful that the task of weighing conflicting medical evidence is within the sole province of the ALJ and that where medical professionals are in disagreement, the trier of fact is in a unique position to determine credibility and weigh the evidence”) (internal quotation marks and citation omitted). Moreover, the ALJ's credibility findings need not be based solely on the kinds of measures that Mr. Gunderson suggests (e.g., that his testifying physicians were more credible because they were seeing more patients).